IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| STANLEY L. HART, III,<br><br>      Plaintiff,<br><br>vs.<br><br>JOHN BALDWIN, KRISTINE WEITZEL, CORNELL SMITH, DARLENE BAUGH, MARY DICK, DUSTIN LUTGEN, DEBORAH EDWARDS, BETTY BROWN, GEORGE MISTER, TOM CONLEY, KELLY HOLDER, TONY COMP, NETTY RENSHAW, MARILYN SHARAR, DOUG THOMPSON,<br><br>      Defendants. | No. C07-3065-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION FOR SUMMARY JUDGMENT** |

      The plaintiff Stanley L. Hart, III brings this action pursuant to 42 U.S.C. § 1983, alleging the defendants have violated his constitutional rights. Hart is an inmate at the Iowa State Penitentiary in Fort Madison, Iowa, but at the time of the events alleged in his Complaint, he was an inmate at the Fort Dodge Correctional Facility ("FDCF") in Fort Dodge, Iowa. The defendant Cornell Smith is Warden and the defendant Darlene Baugh is Deputy Warden of FDCF. The defendants Mary Dick, Dustin Lutgen, Deborah Edwards, George Mister, Tom Conley, Kelly Holder, Tony Comp, Nettie Renshaw, and Marilyn Sharar are employees at FDCF, in various capacities. The defendant John Baldwin is Director of the Iowa Department of Corrections ("Iowa DOC"), and the defendant Kristine Weitzel is Deputy Director and Grievance Coordinator for the Iowa DOC.

## FINDINGS OF FACT

The pleadings, briefs, and exhibits reveal the following facts which the court finds are not in dispute.

Hart was convicted of aiding and abetting the first-degree murder of his aunt, Marilyn Hart, in 2004. *See Hart v. State*, 448 N.W.2d 682 (Iowa Ct. App. 1989); Defendants' Appendix ("App.") Ex. C. In 2004, Hart created a collection of his own original artwork that he titled "The Marilyn Hart Commemorative Collection." His stated purpose for creating the artwork that makes up the collection is to profess responsibility and express remorse for his crime. He describes this as "the single most important activity I do." (Doc. No. 24-4, p. 26 of 30)

In early 2004, Hart engaged in correspondence with the defendant Betty Brown concerning Hart's desire to write a letter to his cousins, the daughters of the victim. Brown and an intern in her office advised Hart that much of his proposed letter was inappropriate, and Hart was advised to take victim impact classes before proceeding further. *See* App. Exs. E, F & G.

In May 2004, Hart contacted Brown again, this time requesting to send each of his cousins a hand-drawn picture of a butterfly, to be framed by Hart's sister prior to presentation to his cousins. *See* App. Ex. H. Brown responded that she would contact Hart's cousins to see if they would accept a letter from him. Brown apparently misunderstood Hart's request to send his cousins a "picture," stating, "I will not ask about a picture of you – they must first want to hear from you." App. Ex. I.

On July 19, 2004, Brown advised Hart through Iowa DOC staff that she had spoken with Marilyn Hart's family, and they were "not interested in responding to [Hart's] letters." App. Ex. J. In July 2004, Hart wrote to Brown again, asking for guidance in how to express his remorse to his cousins. App. Ex. K. Brown again suggested Hart take victim impact classes. App. Ex. L. In September 2004, Hart asked Brown to

"recommend some victims' impact reading." App. Ex. M. Brown declined to recommend any particular books, again advising Hart to take victim impact classes. App. Ex. N.

On April 4, 2005, Hart wrote a letter to attorney Bruce C. McDonald regarding "The Marilyn Hart Commemorative Collection." App. Ex. O. In the letter, Hart explains that he had created a three-volume set of "ink stippled pictures on 100 percent cotton paper," and the purpose of the artwork was "to profess responsibility and to express remorse." *Id*. He stated the pictures in Volume 1 were created for his "cousins or their benefit"; those in Volume 2 were "for other individuals familiar with the tragedy"; and those in Volume 3 were intended "for public donation." *Id*. He also included a copy of the letter he had written to his cousins. Hart indicated that "Chaplain Bruce Kittle of the Sixth Judicial District for Youth Development & Restorative Justice Programs" had expressed interest in including the Volume 1 pictures in materials for a victims' conference, and he stated Chaplain Kittle would forward the Volume 1 pictures to attorney McDonald after the conference. *Id*.

On September 19, 2005, attorney Robert Downer wrote a letter to Hart. Downer stated he had been retained by Hart's cousins in connection with a civil judgment for wrongful death obtained on March 10, 1988, against Hart and the other individual involved in the murder of Marilyn Hart. Downer advised Hart that his dissemination of artwork from the Marilyn Hart Collection was "highly distressing" to the victim's daughters, and he advised Hart to "immediately cease and desist from all actions related to the sale, display or disposition, in any manner, of alleged art designed [sic] as the 'Marilyn Hart Collection' or in any respect referring to Marilyn Hart." App. Ex. P.

Sometime in early 2006, Hart initiated contact with the director of a domestic abuse shelter, offering to donate one of his original artworks from Volume 3 of the Marilyn Hart Commemorative Collection. The shelter wrote to Hart and accepted his request, and Hart sent a piece of artwork to the shelter. In the course of a conversation about other matters, the shelter director happened to mention to Counselor Netti Renshaw that the shelter was

"so pleased that they had received a 'pen/ink drawing' from inmate Hart that was sent as part of his restorative justice work.'" App. Ex. Q. Renshaw advised the shelter that Hart had not received proper permission to donate the artwork and she was unaware of his actions. At her request, the shelter allowed her to retrieve the artwork "to look into how [Hart] may have sent it." *Id*. Renshaw notified Fred Scaletta at the DOC about the issue, and Scaletta advised Renshaw that Hart "should not be allowed to initiate these contacts on his own wothout [sic] passing through both the counselor and Betty [Brown] to ensure that the victim would accept/welcome such a contact." *Id*. Renshaw and Doug Thompson, another FDCF staff member, met with Hart on March 22, 2006, and advised him that he could not send out his artwork "without going through the proper channels." App. Ex. R. They planned to monitor Hart's mail for a period of approximately six months. *Id*.

On April 26, 2006, Doug Thompson was notified by the mail room at FDCF that Hart had attempted to send out a package that apparently contained some of the artwork labeled as being from the Marilyn Hart Commemorative Collection. *See* App. Ex. S. Hart also had given some artwork to Dustin Lutgen for donation to "AVP Facilitators and Harvest Baptist Church." *Id*. On April 27, 2006, Hart was issued a Disciplinary Notice for taking these actions without going through proper channels. *Id*. Hart wrote a statement in response to the Notice in which he indicated he had misunderstood the directive issued at the March 22, 2006, meeting, believing he was only required to go through his counselor "to donate a picture for public auction to the Domestic/Sexual Assault Outreach Center." *See* Doc. No. 24-4, p. 26 of 30.

On May 11, 2006, Administrative Law Judge Deborah Edwards found Hart guilty of violating three of the facility's rules: Rule 23, disobeying a lawful order or direction; Rule 40, misuse of mail, telephone, or other communication; and Rule 43, attempt or complicity. In her ruling, the ALJ noted Hart "has yet to follow proper channels in this facility and in the process he has violated FDCF rules and DOC policies and ignored the

directives given him." App. Ex. S. The ALJ noted that Hart had not violated the rules previously and had "no major report violations," but although Hart stated he had misunderstood his earlier meeting with staff members, he had "failed to clarify when he attempted to mail out the other artwork after the 1st warning." *Id.* The ALJ recommended Hart meet with his counselor and Betty Brown to determine the proper procedures to follow in the future. *Id.* Hart appealed the ALJ's ruling, and on May 25, 2006, Deputy Warden Darlene Baugh affirmed the ALJ's decision. *Id.*

On or about September 6, 2006, Hart requested permission "to submit an article and artwork to Christian Newsletter[.]" App. Ex. T. The request was denied, and Hart again was directed to complete a victim impact course. FDCF staff expressed concern that Hart did not "demonstrate empathy or responsibility for his actions." *Id.*

On November 13, 2006, Hart met with the Parole Board to request commutation of his sentence. His request was denied "due to nature of the crime and seemingly lack of remorse." App. Ex. U. Hart "was informed at this hearing that he was to have, in no way, contact with anyone regarding his victim." *Id.*

On December 5, 2006, Hart sent a letter and some artwork to Paul Carroll, an individual he knew was connected to Hart's cousins. The letter was very similar to Hart's letter to his cousins in 2004, which he had not been allowed to send. App. Ex. V.

On December 21, 2006, Hart's request for commutation of his sentence was heard by an attorney with the Governor's office. App. Ex. W. On January 9, 2007, Governor Vilsack denied Hart's request for commutation. On January 10, 2007, Hart was advised of the Governor's denial of his request for commutation. App. Ex. X.

On January 11, 2007, Linda Sorenson, the Victim Services Coordinator for DOC's Sixth Judicial District, wrote a letter to counselor Marilyn Sharar at FDCF. Sorenson stated she had received a letter and drawing from Hart via Bruce Kittle, a Chaplain in the Sixth Judicial District. Kittle had received several of Hart's drawings and asked Sorenson to take some action regarding them. Sorenson contacted Betty Brown, and then returned

5

the drawing to Sharar. Sorenson suggested Hart go through the victim impact class. App. Ex. Y.

On January 23, 2007, Hart met with Sharar and signed a document agreeing to the following "behavior conditions" to take effect January 24, 2007:

1. No correspondence/drawings/painting/or any item of any kind naming or implying the victim will be sent out of the facility to anyone.
2. Any request by [Hart] regarding victim related correspondence/drawings/paintings or any items of any kind must be submitted to [Hart's] Counselor following completion of Victim Impact Group.
3. Assessment of the request will be considered by Classification Committee, FDCF Warden and Victim Services Coordinator, Betty Brown.

App. Ex. Z.

On February 5, 2007, FDCF Unit Manager George Mister began monitoring Hart's mail "for mail relevant to restorative justice and victim issues/contact." App. Ex. AA (the "Correspondence Memo"). On February 6, 2007, Hart wrote to Warden Cornell Smith asking that his "equal opportunity to Mail" be restored. App. Ex. BB.

On February 8, 2007, Hart was placed in administrative segregation. The stated reasons for the investigation were, "Violating court order, contacting victims. Violating behavior contract by unit manager/victim impact counselors Renshaw and Sharar. Soliciting to engage in criminal conduct." App. Ex. CC. In addition, the notice stated Hart had "[v]iolat[ed] directives involving res[t]orative justice," and violated a "cease and desist order dated Sept. 19, 2005 . . . from Attorney Robert N. Downer, Iowa City." *Id.* Hart waived the 24-hour notice and was seen by the classification team on February 8, 2007. In addition, Hart submitted a written response to the notice. *See* App. Ex. DD. Hart stated he had changed the name of his artwork collection to remove his victim's name, now calling the collection "The Responsibility & Remorse Collection." He also

6

asserted he had complied with the other conditions placed upon him with regard to his correspondence and dissemination of his pictures. *Id*.

On February 12, 2007, the classification team determined that Hart should be placed "on Privilege Level 1 (PL1)," because Hart had "violated both treatment conditions explained repeatedly by counselors." *Id*. The team found that "Hart continues to demonstrate behavior that requires an increased level of supervision that can be provided in PL1. . . . His behavior poses a reasonable threat to the community and further victimization of family members along with other associated members of the community." *Id*.

On February 14, 2007, Hart wrote a memo to Warden Smith to complain that "[e]very single piece of legal mail and material [had] been taken from [him]." App. Ex. EE. The Warden responded that he would look into the situation. *Id*.

On February 15, 2007, Warden Smith wrote a letter to Hart regarding Hart's complaint about the monitoring of his mail. Warden Smith explained the institution's policy about placing the victims' needs first, and he advised Hart as follows:

> I can appreciate your investment to demonstrating your responsibility and remorse; however, the correspondence has created great concern over further victimization. Therefore, this behavior and type of correspondence from you needs to be monitored. I do not feel your equal opportunity rights to correspond are being restricted but monitored for appropriateness of the message you are sending to others.

*Id*.

On February 16, 2007, Mary Dick, Associate Warden of Treatment, denied Hart's appeal of his PL1 classification. App. Ex. GG.

On February 18, 2007, Hart wrote a letter to Warden Smith asking for identification of those individuals who had specifically requested he not write to them, and asserting he had never seen the 2005 letter from attorney Downer. App. Ex. HH. On February 19, 2007, Warden Smith responded by writing handwritten notes on Hart's letter. *Id*.

7

On February 19, 2007, a Disciplinary Notice was issued to Hart for violation of Rule 2, disobeying a law order/direction; Rule 40, misuse of mail, telephone, or other communication; and Rule 43, attempt or complicity. The narrative states, in pertinent part, as follows:

> On 2-2-2007 at 8:30am, I, Counselor Marilyn Sharar, received information from counselor Netti Renshaw regarding her communication from Victim Services Coordinator Betty Brown. Ms. Brown had received notice from people in the community that they had received letters and drawings from Offender Stanley Hart . . . during the Holidays of 2006. This artwork was entitled "The Marilyn Hart Commemorative Collection". Offender Hart was told during classification on 3/22/2006 to not send any artwork out without permission from his Counselor. He did not submit these items to his Counselor for review. As a result, Offender Hart has disobeyed a direct order.

App. Ex. II.

On February 28, 2007, ALJ Edwards found Hart guilty of the charged rules violations. Hart was sanctioned with ten days of disciplinary detention. Hart did not file an appeal. *Id.*; *see* Doc. No. 24-3, ¶ 36, admitting these facts.

On May 14, 2007, Hart submitted an Offender Grievance Complaint regarding his correspondence and the dissemination of his artwork. He attached a detailed chronology of events. App. Ex. JJ. FDCF staff claims not to have received this grievance from Hart. *See id.*; Doc. No. 23-3, ¶ 37. On July 2, 2007, Hart submitted a Grievant Appeal Form because he had not received any response to his May 14, 2007, grievance. App. Ex. JJ.

On July 9, 2007, Warden Smith denied Hart's appeal. In the response, Smith indicated the issues Hart had raised "occurred January, February, March and April of 2007, and the grievance is untimely" under the institution's grievance procedures, requiring a grievance to be filed within thirty days of the alleged incident. *Id.* Hart filed another appeal on July 11, 2007, stating Smith's response "did not provide corrective action." *Id.* On July 31, 2007, Kristine Weitzel, DOC Deputy Director and Grievance

Coordinator, issued a Grievance Response Form on which she indicated, "This grievance has appeal processes in three areas: disciplinary, classification & religious. This office will not respond to this appeal." *Id.*

At all times relevant to the above matters, the Iowa DOC had in place a grievance policy that provided grievance procedures available to prisoners confined in Iowa correctional institutions. *See* App. Ex. KK.

## *SUMMARY JUDGMENT STANDARDS*

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment and provides that either party to a lawsuit may move for summary judgment without the need for supporting affidavits. *See* Fed. R. Civ. P. 56(a), (b). Rule 56 further states that summary judgment:

> should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). A court considering a motion for summary judgment "must view all of the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts." *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F. Supp. 2d 821, 828 (N.D. Iowa 2004) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); and *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996)).

The party seeking summary judgment must "'inform[ ] the district court of the basis for [the] motion and identify[ ] those portions of the record which show lack of a genuine issue.'" *Webster Indus.*, 320 F. Supp. 2d at 829 (quoting *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992), in turn citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986)). A genuine issue of material fact is one

with a real basis in the record. *Id*. (citing *Hartnagel*, 953 F.2d at 394, in turn citing *Matsushita*, 475 U.S. at 586-87, 106 S. Ct. at 1356). Once the moving party meets its initial burden under Rule 56 of showing there is no genuine issue of material fact, the nonmoving party, "by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Webster Indus*, 320 F. Supp. 2d at 829 (citing, *inter alia*, *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; and *Rabushka ex rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997)).

Addressing the quantum of proof necessary to successfully oppose a motion for summary judgment, the Supreme Court has explained that the nonmoving party must produce sufficient evidence to permit "a reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). Furthermore, the Supreme Court has held the trial court must dispose of claims unsupported by fact and determine whether a genuine issue exists for trial, rather than weighing the evidence and determining the truth of the matter. *See Anderson*, 477 U.S. at 249, 106 S. Ct. at 2510; *Celotex*, 477 U.S. at 323-24, 106 S. Ct. at 2552-53; *Matsushita*, 475 U.S. at 586-87, 106 S. Ct. at 1356.

The Eighth Circuit recognizes that "summary judgment is a drastic remedy and must be exercised with extreme. . . ." *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990) (citing Fed. R. Civ. P. 56(c)). The Eighth Circuit, however, also follows the principle that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id*. (quoting *Celotex*, 477 U.S. at 327, 106 S. Ct. at 2555); *see also Hartnagel*, 953 F.2d at 396.

Thus, the trial court must assess whether a nonmovant's response would be sufficient to carry the burden of proof at trial. *Hartnagel*, 953 F.2d at 396 (citing *Celotex*,

477 U.S. at 322, 106 S. Ct. at 2552). If the nonmoving party fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then the moving party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2552; *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990). However, if the court can conclude that a reasonable jury could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir. 1991); *Woodsmith*, 904 F.2d at 1247.

## *HART'S COMPLAINT*

In his Complaint, Hart provides a chronology of events, and he asks for various forms of relief. *See* Doc. No. 6, p. 5. He seeks a declaratory judgment that the defendants' actions violated his constitutional rights. He also seeks an injunction ordering the defendants to do the following: (1) "accept the DOC approved and recognized victims impact program that [Hart] successfully completed in 2003"; (2) rescind the Correspondence Memo and its later extension to telephone calls; (3) expunge the major reports from his record; (4) expunge the classification reduction from his record; (5) expunge "all related entries" from his record; (6) provide him "equal access to all program opportunities"; (7) return the pictures taken from him; (8) cease infringing on his "lawful freedom of expression"; and (8) write a letter of apology to him in which the defendants acknowledge "the positive restorative justice value of [Hart's] efforts."

Finally, he seeks punitive damages and costs of suit, and he requests a jury trial.[1]

---

[1]The court notes the Clerk's docket does not indicate a jury trial has been requested by a party. This is in error.

## DISCUSSION

The defendants move for summary judgment on five separate grounds. They argue Hart's claims are barred by 42 U.S.C. § 1997e(a), which requires the exhaustion of administrative remedies before a suit may be filed; his claims for monetary damages are barred by 42 U.S.C. § 1997e(e), which requires a showing of physical injury before a prisoner may bring an action for mental or emotional injury; his claims for declaratory and injunctive relief are moot; his constitutional rights were not violated; and, in any event, all of the defendants are entitled to qualified immunity from monetary damages. Doc. No. 23-2; Doc. No. 26.

### A. *42 U.S.C. § 1997e(a) - Exhaustion of Remedies*

The defendants argue Hart failed to exhaust his administrative remedies with regard to his request for monetary damages. Doc. No. 26. They also claim Hart failed to exhaust the administrative process for all of his claims, both monetary and equitable, because he failed to file timely a grievance. Doc. No. 23-2, p. 5 (citing App. Ex. JJ, Warden Smith's determination that Hart's grievance was untimely). The defendants therefore argue Hart's claims are barred by 42 U.S.C. § 1997e(a), which prohibits the filing of an action challenging prison conditions "until such administrative remedies as are available are exhausted."

The evidence of record reflects that at no time during the administrative process did Hart request any type of monetary damages for the claimed violations of his constitutional rights. The court finds Hart failed to exhaust the administrative process with regard to his claims for monetary damages, and those claims must be dismissed. 42 U.S.C. § 1997e(a); *see Jones v. Bock*, 549 U.S. 199, 204, 127 S. Ct. 910, 914-15, 166 L. Ed. 2d 798 (2007).

However, the court further finds there is an issue of material fact regarding whether Hart's May 14, 2007, grievance complaint was timely with regard to at least some of his equitable claims. Thus, the undersigned recommends the defendants' motion for summary

judgment be granted with regard to any claim by Hart for monetary damages, whether compensatory, nominal, or punitive in nature. The court recommends the motion be denied on the ground of failure to exhaust as to Hart's equitable claims.

### B. *Claims for Injunctive and Declaratory Relief*

The defendants argue Hart's claims for injunctive and declaratory relief are now moot because he no longer is incarcerated at FDCF. They argue this case "'no longer presents an actual, ongoing case or controversy,'" rendering the case moot and depriving this court of jurisdiction to hear the case. Doc. No. 23-2, p. 6 (quoting *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994)).

In response, Hart argues the same policies and procedures employed at FDCF "are applicable to every Iowa correctional facility located within the Iowa Department of Corrections system." Doc. No. 24-2, p. 5. He asserts that because he remains confined in an Iowa DOC prison, "the policies and procedures used by Defendants at Fort Dodge to suppress [his] First Amendment rights could very well be employed to suppress his rights while [he] is incarcerated at the Iowa State Penitentiary." *Id.* In effect, Hart is arguing his case is not moot because the actions of which he complains are "'capable of repetition yet evading review,'" and thus his case is "justiciable despite its mootness." *Iron Cloud v. Sullivan*, 984 F.2d 241, 243 (8th Cir. 1993) (quoting *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122, 94 S. Ct. 1694, 1698, 40 L. Ed. 2d 1 (1974)).

Under Article III of the United States Constitution, the court can only grant effective relief where there is an actual case and controversy. *Beck v. Missouri State High School Activities Ass'n*, 18 F.3d 604, 605 (8th Cir. 1994) (citing *Arkansas AFL-CIO v. FCC*, 11 F.3d 1430, 1435 (8th Cir. 1993)). "[A]n actual controversy must exist at all stages of appellate review, not merely at the time the complaint is filed.'" *Id.* (quoting *Honig v. Doe*, 484 U.S. 305, 329, 108 S. Ct. 592, 607, 98 L. Ed. 2d 686 (1988) (Rehnquist, C.J., concurring)). When the issues in the case "lose their life because of the passage of time

or a change in circumstances," the case is moot and the court no longer has power to decide the case. *Id.* (citing *Arkansas AFL-CIO*, 11 F.3d at 1435).

An inmate's claim for equitable relief to improve prison conditions ordinarily becomes moot when the inmate is transferred to another facility and is no longer subject to those conditions. *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999) (citing *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985); *Hickman v. Missouri*, 144 F.3d 1141, 1142 (8th Cir. 1998)).

To determine whether a request for declaratory or injunctive relief has become moot, the court must examine whether the facts alleged demonstrate a substantial controversy that is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Preiser v. Newkirk*, 422 U.S. 395, 402, 95 S. Ct. 2330, 2334, 45 L. Ed. 2d 272 (1975); *accord Smith*, 190 F.3d at 855. "A claim for equitable relief is moot 'absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again.'" *Randolph v. Rodgers*, 170 F.3d 850, 856 (8th Cir. 1999) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S. Ct. 1660, 1670, 75 L. Ed. 2d 675 (1983)).

An exception to the mootness doctrine exists when two circumstances are present: "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Smith*, 190 F.3d at 855 (citing *Hickman*, 144 F.3d at 142-43). The exception "applies only in exceptional situations." *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109, 103 S. Ct. 1660, 1669, 75 L. Ed. 2d 675 (1983); *Hickman*, 144 F.3d at 142).

In the present case, there is no evidence that the facility to which Hart was transferred is imposing the same types of restrictions on him as FDCF. Although the two facilities operate under the same Iowa DOC policies and procedures, it is FDCF's interpretation and application of those policies and procedures of which Hart complains,

and he has made no showing that other facilities in the Iowa prison system would follow a similar interpretation. Speculation that they might impose similar restrictions on Hart's activities is not enough to invoke the exception to the mootness doctrine. *See Smith*, 190 F.3d at 855. "Although this case theoretically is capable of repetition, we do not believe that the facts here suggest 'a reasonable expectation that the same complaining party would be subjected to the same action again.'" *Iron Cloud*, 984 F.2d at 243 (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S. Ct. 347, 349, 46 L. Ed. 2d 350 (1975)).[2]

---

[2]In addition, even if Hart had remained at FDCF or is returned there at some point during his incarceration, the court notes that through the actions of an Assistant Citizens' Aide/Ombudsman for the State of Iowa, FDCF altered its policy with regard to the inspection of Hart's mail in December 20, 2007, adopting the following policy:

    1    FDCF will not allow Mr. Hart to have any contact with the family of his victim, or those requesting no contact.
    2    FDCF further "suggests" that Mr. Hart not send artwork to third parties outside the institution bearing his victim's name.
    3    Mr. Hart's mail will not be confiscated if he violates #2, and he will not face discipline for doing so, unless that mail is found to pose a risk to the security or order of the institution.
    4    FDCF will continue as it has since July [2007], not to regularly monitor the content of Mr. Hart's outgoing mail. However, the content of Mr. Hart's mail will remain subject to random checks, as with all inmates, in the interest of security.

*See* Letter dated December 20, 2007, from Bert Dalmer to Stanley Hart (included as part of Hart's *pro se, ex parte* correspondence to the court, Doc. No. 27). The Clerk of Court is directed to send a copy of the Dalmer letter to the defendants' attorney (but not the remainder of the correspondence in Doc. No. 27).

FDCF's voluntary cessation of the monitoring of Hart's mail and dissemination of his artwork also renders Hart's claims for equitable relief moot. *See Beck v. Missouri State High School Activities Ass'n*, 18 F.3d 604, 605 (8th Cir. 1994) (citing *Arkansas AFL-CIO v. FCC*, 11 F.3d 1430, 1435 (8th Cir. 1993)).

The court concludes the exception to the mootness doctrine does not apply, and the case is moot. Accordingly, the defendants' motion for summary judgment on Hart's equitable claims should be granted.

### c. *Remaining grounds for relief*

Because the court has concluded that the defendants' motion for summary judgment should be granted on non-constitutional grounds, the court does not address the merits of Hart's First Amendment claim. This is consistent with the court's "obligation to avoid judicial legislation." *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 479, 115 S. Ct. 1003, 1019, 130 L. Ed. 2d 964 (1995); *see United States v. Allen*, 406 F.3d 940, 946 (8th Cir. 2005) ("When we are confronted with several possible grounds for deciding a case, any of which would lead to the same result, we choose the narrowest ground in order to avoid unnecessary adjudication of constitutional issues.") (citing *Nat'l Treasury Emp. Union*, 513 U.S. at 478, 115 S. Ct. at 1019); *Vruno v. Schwarzwalder*, 600 F.2d 124, 129 n.6 (8th Cir. 1979) (generally courts will "refrain from reaching a constitutional issue if the case might be disposed of on a non-constitutional ground").

Having concluded the defendants' motion should be granted as to Hart's claim for monetary damages on failure-to-exhaust grounds, and as to his claim for equitable relief on mootness grounds, the court does not reach the additional arguments asserted by the defendants.

## *CONCLUSION*

The undersigned therefore **RESPECTFULLY RECOMMENDS**, unless any party files objections[3] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the defendants' motion for summary judgment be granted.

**IT IS SO ORDERED.**

**DATED** this 23rd day of July, 2009.

*[signature]*

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[3]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.