**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

STANLEY L. HART, III,

        Plaintiff,

vs.

JOHN BALDWIN, KRISTINE
WEITZEL, CORNELL SMITH,
DARLENE BAUGH, MARY DICK,
DUSTIN LUTGEN, DEBORAH
EDWARDS, BETTY BROWN,
GEORGE MISTER, TOM CONLEY,
KELLY HOLDER, TONY COMP,
NETTI RENSHAW, MARILYN
SHARAR, and DOUG THOMPSON,

        Defendants.

No. C07-3065-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION**

---

**TABLE OF CONTENTS**

*I.  INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *B.  Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*II.  LEGAL STANDARDS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    *A.  Standards for a Magistrate Judge's Report and Recommendation* . . . . 15
    *B.  Standards for Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . . 20

*III.  ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    *A.  The Defendants' Grounds for Summary Judgment* . . . . . . . . . . . . . 24
    *B.  Exhaustion of Remedies Under 42 U.S.C. § 1997e(a)* . . . . . . . . . . . 25
        *1.  Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . . . . 25
        *2.  Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*IV.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# I. INTRODUCTION

## A. Procedural Background

On April 23, 2008, plaintiff Stanley Hart, III, filed his *pro se*[1] Complaint (docket no. 6) with this court pursuant to 42 U.S.C. § 1983. In his complaint, Hart, an inmate at the Iowa State Penitentiary ("ISP") in Fort Madison, Iowa, alleges violations of his constitutional rights that occurred while he was an inmate at the Fort Dodge Correctional Facility ("FDCF"), in Fort Dodge, Iowa. Specifically, Hart's complaint asks the court for a declaration that defendants'[2] acts and omissions, as will be described below, violated his First Amendment right "to freedom of expression/correspondence/communication." Docket no. 6. He also seeks a preliminary and permanent injunction ordering the defendants to: (1) "accept the [Iowa Department of Corrections' ("IDOC")] approved and recognized victims impact program that plaintiff successfully completed in 2003;" (2) "rescind the 'Correspondence' memo and its extension to phone calls;" (3) "expunge the major reports from plaintiff's record;" (4) "expunge the investigative segregation from plaintiff's record;" (5) "expunge the level reduction classification from plaintiff's record;"

---

[1] On June 27, 2008, Jeffrey Lipman appeared as Hart's counsel. *See* docket no. 13.

[2] It is undisputed that the defendants held the following positions at all relevant times: John Baldwin was the Director of the Iowa Department of Corrections ("IDOC"); Kristine Weitzel was a Deputy Director and Grievance Coordinator for the IDOC; Cornell Smith was the Warden of the FDCF; Darlene Baugh was the Deputy Warden at the FDCF; Mary Dick was the Treatment Director at the FDCF; Dustin Lutgen was the Treatment Manager at the FDCF; Deborah Edwards was the Administrative Law Judge at the FDCF; Betty Brown was the Victim Services Coordinator for the IDOC; George Mister and Tom Conley were Unit Managers at the FDCF; Kelly Holder and Tony Comp were Correctional Officers at the FDCF; and Netti Renshaw and Marilyn Sharar were Counselors at the FDCF. Docket no. 23-3.

(6) "expunge all related entries from plaintiff's record;" (7) permit plaintiff equal access to all program opportunities; (8) "return the pictures taken;" (9) "cease infringing on plaintiff's lawful freedom of expression;" and (10) "write a[n] apology letter to the plaintiff that acknowledges the positive restorative justice value of plaintiff's efforts." *Id.* Hart also seeks compensatory and punitive damages and requests a jury trial.

The defendants filed an answer on June 23, 2008, which includes the following affirmative defenses: (1) that Hart has failed to state a claim upon which relief can be granted; (2) that Hart's claim is barred by 42 U.S.C. § 1997e(a)[3]; (3) that Hart's claim is barred by 42 U.S.C. § 1997e(e)[4]; and (4) that the defendants are entitled to qualified immunity. *See* docket no. 10.

On December 19, 2008, the defendants filed their Motion for Summary Judgment (docket no. 23); Memorandum in Support of Defendants' Motion for Summary Judgment (docket no. 23-2); Defendants' Statement of Undisputed Material Facts (docket no. 23-3); and Appendix (docket no. 23-4). In their memorandum, the defendants assert several arguments in support of their motion for summary judgment. First, the defendants argue that Hart's claims are barred by 42 U.S.C. § 1997e(e) as Hart does not allege that he suffered any physical injury as a result of the defendants' actions. Second, the defendants

---

[3] Section 1997e(a) states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

[4] Section 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).

assert that Hart's claims are barred by 42 U.S.C. § 1997e(a), because Hart did not exhaust his administrative remedies for his claims prior to filing this action. Third, the defendants argue that Hart's claims for declaratory and injunctive relief are moot because Hart is no longer incarcerated at the FDCF—Hart is now located at the ISP. And fourth, the defendants claim that at no time were Hart's constitutional rights violated. In the alternative, the defendants claim that they are entitled to qualified immunity from monetary damages.

On January 12, 2009, Hart filed his Resistance to Defendants' Motion for Summary Judgment (docket no. 24); Memorandum in Support of Plaintiff's Resistance to Defendants' Motion for Summary Judgment (docket no. 24-2); Statement of Material Facts in Support of Plaintiff's Resistance to Defendants' Motion for Summary Judgment (docket no. 24-3); and Appendix in Support of Plaintiff's Resistance to Defendants' Motion for Summary Judgment (docket no. 24-4). In Hart's brief, he first admits that 42 U.S.C. § 1997e(e) bars any claim he may have for compensatory damages. However, Hart does not concede that § 1997e(e) bars his request for nominal and punitive damages. Second, Hart asserts that his claims are not barred by 42 U.S.C. § 1997e(a), and argues that he fully and timely grieved the complained of issues. Third, Hart argues that his claims for declaratory and injunctive relief are not moot because, even though he is no longer incarcerated at the FDCF, he is still subject to the same policies and procedures—Hart claims that the policies and procedures employed by the defendants are applicable to every Iowa correctional facility located within the IDOC system. As a result, Hart claims that the policies and procedures used by the defendants could very well be employed to suppress his rights. Fourth, Hart claims that his constitutional rights—his First Amendment rights pertaining to free speech—were violated when his outgoing mail was censored and confiscated. Fifth, Hart argues that the defendants are not entitled to

qualified immunity, as Hart claims that he has alleged a violation of a constitutional right that was well established at the time the defendants acted in violation of the right.

On July 1, 2009, the defendants supplemented their Motion for Summary Judgment with their Supplementation to Their Memorandum in Support of Their Motion for Summary Judgment (docket no. 26). In the defendants' supplement, they provide additional argument concerning whether Hart's claims are barred under 42 U.S.C. § 1997e(a) and whether Hart's constitutional rights were violated by any regulations or restrictions placed on his correspondence.

On July 23, 2009, Chief United States Magistrate Judge Paul A. Zoss issued a report and recommendation in this case. First, Judge Zoss found that Hart failed to exhaust the administrative process pursuant to 42 U.S.C. § 1997e(a), with regard to his claims for monetary damages, and recommends dismissing those claims. However, Judge Zoss recommended denying the motion under § 1997e(a) related to the claims for injunctive relief and declaratory judgment, as he found a genuine issue of material fact concerning whether at least some of these claims were timely filed in Hart's May 14, 2007, grievance complaint. Nevertheless, Judge Zoss recommended dismissing Hart's claims for injunctive and declaratory relief, as they are now moot—according to Judge Zoss, Hart's transfer to another prison mooted these claims, and the exception to the mootness doctrine is not applicable in this case because there is not "a reasonable expectation that the same complaining party would be subjected to the same action again." Docket no. 29 (quoting *Iron Cloud v. Sullivan*, 984 F.2d 241, 243 (8th Cir. 1993), in turn quoting *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L. Ed. 2d 350 (1975)). Judge Zoss also notes, in a footnote, that FDCF altered its policy concerning the inspection of Hart's mail on December 20, 2007. Judge Zoss did not discuss the merits

of Hart's constitutional claim, or the merits of the defendants' qualified immunity claim, as Judge Zoss recommends dismissal of all Hart's claims on other grounds.

Hart filed his Objections to Report and Recommendation on Motion for Summary Judgment on August 3, 2009 (docket no. 30); Supplemental Appendix to Objection to Report and Recommendation on Motion for Summary Judgment (docket no. 30-2); and *pro se* addition to his objection (docket no. 30-3). Hart objects to Judge Zoss's evaluation of the mootness issue, and claims that the First Amendment restrictions have not been lifted and that "ISP seems to be implying the only way the [restrictions] can be lifted is with FDCF's cooperation and/or permission." Docket no. 30. As a result, Hart claims that "there is a 'real and immediate threat that the plaintiff will be wronged again.'" *Id.* (quoting *Randolph v. Rogers*, 170 F.3d 850, 856 (8th Cir. 1999) (additional citation and quotation marks omitted)). In Hart's *pro se* addition to his objection, he first claims that he properly exhausted his remedies—his counsel had not pursued a similar objection. In support of this claim, Hart argues that the applicable "grievance policy does not require monetary damages to be claimed/exhausted so they cannot[5] be inferred or implied." Docket no. 30-3. Hart supports this assertion by claiming that his contract attorney never said monetary damages had to be in the grievance, reviewed the grievance before it was submitted, reviewed all grievance responses and concluded that Hart had exhausted his remedies, and reviewed the complaint prior to filing it with this court. Hart argues that he cannot know more than the policy states or more than the contract attorney—he claims that his contract attorney was ineffective if he did not properly exhaust his grievance remedies. Second, Hart argues, as his counsel had, that his request for declaratory and injunctive relief is not moot. Hart claims that the censorship was never rescinded, for

---

[5] Hart likely meant *can* be inferred or implied.

generally the same reasons as were articulated by his counsel. Hart also argues that "[v]iolating my rights for years and continuing to do so is not moot;" and that "[j]ust rescinding the censorship at some point will not correct the harm already done for years." Docket no. 30-3.

## B. *Factual Background*

In his Report and Recommendation, Judge Zoss found that the pleadings, briefs, and exhibits revealed the following undisputed facts:

> Hart was convicted of aiding and abetting the first-degree murder of his aunt, Marilyn Hart. *See Hart v. State*, 448 N.W.2d 682 (Iowa Ct. App. 1989); Defendants' Appendix ("App.") Ex. C. In 2004, Hart created a collection of his own original artwork that he titled "The Marilyn Hart Commemorative Collection." His stated purpose for creating the artwork that makes up the collection is to profess responsibility and express remorse for his crime. He describes this as "the single most important activity I do." (Doc. No. 24-4, p. 26 of 30)

> In early 2004, Hart engaged in correspondence with the defendant Betty Brown concerning Hart's desire to write a letter to his cousins, the daughters of the victim. Brown and an intern in her office advised Hart that much of his proposed letter was inappropriate, and Hart was advised to take victim impact classes before proceeding further. *See* App. Exs. E, F & G.

> In May 2004, Hart contacted Brown again, this time requesting to send each of his cousins a hand-drawn picture of a butterfly, to be framed by Hart's sister prior to presentation to his cousins. *See* App. Ex. H. Brown responded that she would contact Hart's cousins to see if they would accept a letter from him. Brown apparently misunderstood Hart's

request to send his cousins a "picture," stating, "I will not ask about a picture of you – they must first want to hear from you." App. Ex. I.

On July 19, 2004, Brown advised Hart through Iowa DOC staff that she had spoken with Marilyn Hart's family, and they were "not interested in responding to [Hart's] letters." App. Ex. J. In July 2004, Hart wrote to Brown again, asking for guidance in how to express his remorse to his cousins. App. Ex. K. Brown again suggested Hart take victim impact classes. App. Ex. L. In September 2004, Hart asked Brown to "recommend some victims' impact reading." App. Ex. M. Brown declined to recommend any particular books, again advising Hart to take victim impact classes. App. Ex. N.

On April 4, 2005, Hart wrote a letter to attorney Bruce C. McDonald regarding "The Marilyn Hart Commemorative Collection." App. Ex. O. In the letter, Hart explains that he had created a three-volume set of "ink stippled pictures on 100 percent cotton paper," and the purpose of the artwork was "to profess responsibility and to express remorse." *Id.* He stated the pictures in Volume 1 were created for his "cousins or their benefit"; those in Volume 2 were "for other individuals familiar with the tragedy"; and those in Volume 3 were intended "for public donation." *Id.* He also included a copy of the letter he had written to his cousins. Hart indicated that "Chaplain Bruce Kittle of the Sixth Judicial District for Youth Development & Restorative Justice Programs" had expressed interest in including the Volume 1 pictures in materials for a victims' conference, and he stated Chaplain Kittle would forward the Volume 1 pictures to attorney McDonald after the conference. *Id.*

On September 19, 2005, attorney Robert Downer wrote a letter to Hart. Downer stated he had been retained by Hart's cousins in connection with a civil judgment for wrongful death obtained on March 10, 1988, against Hart and the other

individual involved in the murder of Marilyn Hart. Downer advised Hart that his dissemination of artwork from the Marilyn Hart Collection was "highly distressing" to the victim's daughters, and he advised Hart to "immediately cease and desist from all actions related to the sale, display or disposition, in any manner, of alleged art designed [sic] as the 'Marilyn Hart Collection' or in any respect referring to Marilyn Hart." App. Ex. P.

Sometime in early 2006, Hart initiated contact with the director of a domestic abuse shelter, offering to donate one of his original artworks from Volume 3 of the Marilyn Hart Commemorative Collection. The shelter wrote to Hart and accepted his request, and Hart sent a piece of artwork to the shelter. In the course of a conversation about other matters, the shelter director happened to mention to Counselor Netti Renshaw that the shelter was "so pleased that they had received a 'pen/ink drawing' from inmate Hart that was sent as part of his restorative justice work.'" App. Ex. Q. Renshaw advised the shelter that Hart had not received proper permission to donate the artwork and she was unaware of his actions. At her request, the shelter allowed her to retrieve the artwork "to look into how [Hart] may have sent it." *Id.* Renshaw notified Fred Scaletta at the DOC about the issue, and Scaletta advised Renshaw that Hart "should not be allowed to initiate these contacts on his own wothout [sic] passing through both the counselor and Betty [Brown] to ensure that the victim would accept/welcome such a contact." *Id.* Renshaw and Doug Thompson, another FDCF staff member, met with Hart on March 22, 2006, and advised him that he could not send out his artwork "without going through the proper channels." App. Ex. R. They planned to monitor Hart's mail for a period of approximately six months. *Id.*

On April 26, 2006, Doug Thompson was notified by the mail room at FDCF that Hart had attempted to send out a

package that apparently contained some of the artwork labeled as being from the Marilyn Hart Commemorative Collection. *See* App. Ex. S. Hart also had given some artwork to Dustin Lutgen for donation to "AVP Facilitators and Harvest Baptist Church." *Id.* On April 27, 2006, Hart was issued a Disciplinary Notice for taking these actions without going through proper channels. *Id.* Hart wrote a statement in response to the Notice in which he indicated he had misunderstood the directive issued at the March 22, 2006, meeting, believing he was only required to go through his counselor "to donate a picture for public auction to the Domestic/Sexual Assault Outreach Center." *See* Doc. No. 24-4, p. 26 of 30.

On May 11, 2006, Administrative Law Judge Deborah Edwards found Hart guilty of violating three of the facility's rules: Rule 23, disobeying a lawful order or direction; Rule 40, misuse of mail, telephone, or other communication; and Rule 43, attempt or complicity. In her ruling, the ALJ noted Hart "has yet to follow proper channels in this facility and in the process he has violated FDCF rules and DOC policies and ignored the directives given him." App. Ex. S. The ALJ noted that Hart had not violated the rules previously and had "no major report violations," but although Hart stated he had misunderstood his earlier meeting with staff members, he had "failed to clarify when he attempted to mail out the other artwork after the 1st warning." *Id.* The ALJ recommended Hart meet with his counselor and Betty Brown to determine the proper procedures to follow in the future. *Id.* Hart appealed the ALJ's ruling, and on May 25, 2006, Deputy Warden Darlene Baugh affirmed the ALJ's decision. *Id.*

On or about September 6, 2006, Hart requested permission "to submit an article and artwork to Christian Newsletter[.]" App. Ex. T. The request was denied, and Hart again was directed to complete a victim impact course. FDCF

staff expressed concern that Hart did not "demonstrate empathy or responsibility for his actions." *Id.*

On November 13, 2006, Hart met with the Parole Board to request commutation of his sentence. His request was denied "due to nature of the crime and seemingly lack of remorse." App. Ex. U. Hart "was informed at this hearing that he was to have, in no way, contact with anyone regarding his victim." *Id.*

On December 5, 2006, Hart sent a letter and some artwork to Paul Carroll, an individual he knew was connected to Hart's cousins. The letter was very similar to Hart's letter to his cousins in 2004, which he had not been allowed to send. App. Ex. V.

On December 21, 2006, Hart's request for commutation of his sentence was heard by an attorney with the Governor's office. App. Ex. W. On January 9, 2007, Governor Vilsack denied Hart's request for commutation. On January 10, 2007, Hart was advised of the Governor's denial of his request for commutation. App. Ex. X.

On January 11, 2007, Linda Sorenson, the Victim Services Coordinator for DOC's Sixth Judicial District, wrote a letter to counselor Marilyn Sharar at FDCF. Sorenson stated she had received a letter and drawing from Hart via Bruce Kittle, a Chaplain in the Sixth Judicial District. Kittle had received several of Hart's drawings and asked Sorenson to take some action regarding them. Sorenson contacted Betty Brown, and then returned the drawing to Sharar. Sorenson suggested Hart go through the victim impact class. App. Ex. Y.

On January 23, 2007, Hart met with Sharar and signed a document agreeing to the following "behavior conditions" to take effect January 24, 2007:

1.  No correspondence/drawings/painting/or any item of any kind naming or implying the victim will be sent out of the facility to anyone.

2.  Any request by [Hart] regarding victim related correspondence/drawings/paintings or any items of any kind must be submitted to [Hart's] Counselor following completion of Victim Impact Group.

3.  Assessment of the request will be considered by Classification Committee, FDCF Warden and Victim Services Coordinator, Betty Brown.

App. Ex. Z.

On February 5, 2007, FDCF Unit Manager George Mister began monitoring Hart's mail "for mail relevant to restorative justice and victim issues/contact." App. Ex. AA (the "Correspondence Memo"). On February 6, 2007, Hart wrote to Warden Cornell Smith asking that his "equal opportunity to Mail" be restored. App. Ex. BB.

On February 8, 2007, Hart was placed in administrative segregation. The stated reasons for the investigation were, "Violating court order, contacting victims. Violating behavior contract by unit manager/victim impact counselors Renshaw and Sharar. Soliciting to engage in criminal conduct." App. Ex. CC. In addition, the notice stated Hart had "[v]iolat[ed] directives involving res[t]orative justice," and violated a "cease and desist order dated Sept. 19, 2005 . . . from Attorney Robert N. Downer, Iowa City." *Id.* Hart waived the 24-hour notice and was seen by the classification team on February 8, 2007. In addition, Hart submitted a written response to the notice. *See* App. Ex. DD. Hart stated he had changed the name of his artwork collection to remove his victim's name, now calling the collection "The Responsibility & Remorse Collection." He also asserted he had complied with the other conditions placed upon him with regard to his correspondence and dissemination of his pictures. *Id.*

On February 12, 2007, the classification team determined that Hart should be placed "on Privilege Level 1 (PL1)," because Hart had "violated both treatment conditions explained repeatedly by counselors." *Id.* The team found that "Hart continues to demonstrate behavior that requires an increased level of supervision that can be provided in PL1. . . . His behavior poses a reasonable threat to the community and further victimization of family members along with other associated members of the community." *Id.*

On February 14, 2007, Hart wrote a memo to Warden Smith to complain that "[e]very single piece of legal mail and material [had] been taken from [him]." App. Ex. EE. The Warden responded that he would look into the situation. *Id.*

On February 15, 2007, Warden Smith wrote a letter to Hart regarding Hart's complaint about the monitoring of his mail. Warden Smith explained the institution's policy about placing the victims' needs first, and he advised Hart as follows:

I can appreciate your investment to demonstrating your responsibility and remorse; however, the correspondence has created great concern over further victimization. Therefore, this behavior and type of correspondence from you needs to be monitored. I do not feel your equal opportunity rights to correspond are being restricted but monitored for appropriateness of the message you are sending to others.

*Id.*

On February 16, 2007, Mary Dick, Associate Warden of Treatment, denied Hart's appeal of his PL1 classification. App. Ex. GG.

On February 18, 2007, Hart wrote a letter to Warden Smith asking for identification of those individuals who had specifically requested he not write to them, and asserting he

had never seen the 2005 letter from attorney Downer. App. Ex. HH. On February 19, 2007, Warden Smith responded by writing handwritten notes on Hart's letter. *Id.*

On February 19, 2007, a Disciplinary Notice was issued to Hart for violation of Rule 2, disobeying a law order/direction; Rule 40, misuse of mail, telephone, or other communication; and Rule 43, attempt or complicity. The narrative states, in pertinent part, as follows:

On 2-2-2007 at 8:30am, I, Counselor Marilyn Sharar, received information from counselor Netti Renshaw regarding her communication from Victim Services Coordinator Betty Brown. Ms. Brown had received notice from people in the community that they had received letters and drawings from Offender Stanley Hart . . . during the Holidays of 2006. This artwork was entitled "The Marilyn Hart Commemorative Collection". Offender Hart was told during classification on 3/22/2006 to not send any artwork out without permission from his Counselor. He did not submit these items to his Counselor for review. As a result, Offender Hart has disobeyed a direct order.

App. Ex. II.

On February 28, 2007, ALJ Edwards found Hart guilty of the charged rules violations. Hart was sanctioned with ten days of disciplinary detention. Hart did not file an appeal. *Id.*; *see* Doc. No. 24-3, ¶ 36, admitting these facts.

On May 14, 2007, Hart submitted an Offender Grievance Complaint regarding his correspondence and the dissemination of his artwork. He attached a detailed chronology of events. App. Ex. JJ. FDCF staff claims not to have received this grievance from Hart. *See id.*; Doc. No. 23-3, ¶ 37. On July 2, 2007, Hart submitted a Grievant Appeal

Form because he had not received any response to his May 14, 2007, grievance. App. Ex. JJ.

On July 9, 2007, Warden Smith denied Hart's appeal. In the response, Smith indicated the issues Hart had raised "occurred January, February, March and April of 2007, and the grievance is untimely" under the institution's grievance procedures, requiring a grievance to be filed within thirty days of the alleged incident. *Id.* Hart filed another appeal on July 11, 2007, stating Smith's response "did not provide corrective action." *Id.* On July 31, 2007, Kristine Weitzel, DOC Deputy Director and Grievance Coordinator, issued a Grievance Response Form on which she indicated, "This grievance has appeal processes in three areas: disciplinary, classification & religious. This office will not respond to this appeal." *Id.*

At all times relevant to the above matters, the Iowa DOC had in place a grievance policy that provided grievance procedures available to prisoners confined in Iowa correctional institutions. *See* App. Ex. KK.

Docket no. 29.

## II. LEGAL STANDARDS

### A. Standards for a Magistrate Judge's Report and Recommendation

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.

> The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court *may* review *de novo* any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential review"). The *de novo* review of a magistrate judge's report and recommendation, however, only means a district

court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while *de novo* review generally involves review of an entire matter, in the context of § 636 a district court's *required de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general *pro se* objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is

appropriate."). Therefore, this court will strive to provide *de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a

definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.[6]

---

[6] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United*

(continued...)

## B. Standards for Summary Judgment

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. FED R. CIV. P.

---

[6](...continued)

*States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will *not* result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time").  Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248.  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not.  *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence").  Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S.

at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a genuine issue of material fact is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is

satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at

366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. FED. R. CIV. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgment is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

## III.  ANALYSIS

### A.  The Defendants' Grounds for Summary Judgment

The defendants assert five grounds in support of their motion for summary judgment:  (1) that Hart's claims are barred by 42 U.S.C. § 1997e(e) as Hart does not allege that he suffered any physical injury as a result of the defendants' actions; (2) that Hart's claims are barred by 42 U.S.C. § 1997e(a), because Hart did not exhaust his administrative remedies concerning his claims prior to filing his action with this court; (3) that Hart's claims for declaratory and injunctive relief are moot because Hart is no longer

incarcerated at the FDCF—Hart is now located at the ISP; (4) that at no time were Hart's constitutional rights violated; and (5) that defendants are entitled to qualified immunity from monetary damages. The court will first evaluate whether Hart exhausted his administrative remedies—should the court find Hart failed to exhaust his administrative remedies, the case will be dismissed pursuant to 42 U.S.C. § 1997e(a).

### B. Exhaustion of Remedies Under 42 U.S.C. § 1997e(a)

### 1. Arguments of the parties

The defendants argue, in their Motion for Summary Judgment, that Hart's claims are barred under § 1997e(a), because he failed to exhaust his remedies within the IDOC grievance process. Specifically, the defendants allege that Hart did not timely file a grievance and, therefore, all of his claims should be dismissed. In Hart's response, he argues that he fully exhausted the grievance process and that his May 14, 2007, grievance complaint was not untimely because the incidents he described "were continuing violations that extended well into the thirty day deadline." Docket no. 24-2.

Judge Zoss found that § 1997e(a) barred Hart's claims for monetary damages because there was no evidence in the record that he exhausted any claims for monetary damages at the administrative level. However, Judge Zoss found that there was a genuine issue of material fact concerning whether Hart's May 14, 2007, grievance was timely. Because Hart's grievance also contained claims for injunctive relief and a declaratory judgment, which Judge Zoss found may have been grieved in a timely manner, he did not recommend dismissing any of these claims under § 1997e(a).

Hart does not object to Judge Zoss's findings concerning § 1997e(a) in his Objections to Report and Recommendation on Motion for Summary Judgment (docket no. 30). However, in Hart's *pro se* addition to his objection (docket no. 30-3), he claims that

he properly exhausted his remedies because: (1) the applicable "grievance policy does not require monetary damages to be claimed/exhausted so they cannot[7] be inferred or implied;" (2) his contract attorney never said monetary damages had to be in the grievance, reviewed the grievance before it was submitted, reviewed all grievance responses, and concluded that he had exhausted his remedies; and (3) his contract attorney had reviewed the complaint prior to filing it with this court. Hart argues that he cannot know more than the policy states, or more than the contract attorney, and that his contract attorney was ineffective if she did not properly exhaust his grievance remedies. Hart's *pro se* objections to Judge Zoss's findings under § 1997e(a) prompt the court to review the issue of exhaustion *de novo*. *See* 28 U.S.C. § 636(b)(1).

### 2. Analysis

"Congress enacted the Prison Litigation Reform Act of 1995 [("PLRA")]. . . 42 U.S.C. § 1997e *et seq.*, in 1996 in the wake of a sharp rise in prisoner litigation in the federal courts. . . ." *Woodford v. Ngo*, 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006). Title 42 U.S.C. § 1997e(a) states:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The United States Supreme Court has explained the purpose of § 1997e(a)'s exhaustion requirement:

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the

---

[7] Hart likely meant *can* be inferred or implied.

> potential to reduce the number of inmate suits, and also to
> improve the quality of suits that are filed by producing a useful
> administrative record.

*Jones v. Bock*, 549 U.S. 199, 204, 127 S.Ct. 910, 914-15 (citing *Woodford*, 548 U.S. at 94-95, 126 S.Ct. at 2388 (2006)). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Id.* at 211, 918-19. (citing *Porter v. Nussle*, 534 U.S. 516, 524, 122 S.Ct. 983 (2002)).

The Court has explained that the PLRA's exhaustion requirement requires "proper exhaustion." *Woodford*, 548 U.S. at 93, 126 S.Ct. at 2387. Proper exhaustion generally requires compliance with the prison system's procedural rules, *id.* at 95, 2388, and proper exhaustion under the PLRA is "not satisfied when grievances [are] dismissed because prisoners [have] missed deadlines set by the grievance policy." *Jones*, 549 U.S. at 217-18, 127 S.Ct. at 922 (citing *Woodford* 548 U.S. at 93-95, 126 S.Ct. at 2378). Concerning the requirement of proper exhaustion, the Court has reasoned that:

> The benefits of exhaustion can be realized only if the prison
> grievance system is given a fair opportunity to consider the
> grievance. The prison grievance system will not have such an
> opportunity unless the grievant complies with the system's
> critical procedural rules. A prisoner who does not want to
> participate in the prison grievance system will have little
> incentive to comply with the system's procedural rules unless
> noncompliance carries a sanction. . . . For example, a
> prisoner wishing to bypass available administrative remedies
> could simply file a late grievance without providing any reason
> for failing to file on time. If the prison then rejects the
> grievance as untimely, the prisoner could proceed directly to
> federal court. And acceptance of the late grievance would not
> thwart the prisoner's wish to bypass the administrative
> process; the prisoner could easily achieve this by violating
> other procedural rules until the prison administration has no
> alternative but to dismiss the grievance on procedural grounds.

> We are confident that the PLRA did not create such a toothless scheme.

*Woodford*, 548 U.S. at 95, 126 S.Ct. 2388. Although the requirement of proper exhaustion might appear to be harsh for prisoners who lack legal training or are poorly educated, the Court has observed that prison grievance systems are generally informal and relatively simple and are not inconsistent with a prisoner's *pro se* responsibilities to comply with deadlines and other requirements in federal court. *Id.* at 103, 2393. Prisoners are not required to plead or otherwise demonstrate exhaustion in their complaint, but failure to exhaust is an affirmative defense. *See Jones*, 549 U.S. at 216, 127 S.Ct. at 921 ("[F]ailure to exhaust is an affirmative defense under the PLRA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints.")

In this case, defendant Warden Cornell Smith found that Hart's grievance was untimely. Docket no. 23-4, p. 100. The defendants assert, as an affirmative defense in their Answer (docket no. 10), Hart's failure to exhaust under § 1997e(a), and subsequently move for summary judgment on the same grounds. *See* docket no. 23. As a result, the court will consider if there is a genuine issue of material fact concerning whether Hart has fulfilled the requirement of "properly" exhausting his administrative remedies. *See* 42 U.S.C. § 1997e(a); *Woodford*, 548 U.S. at 93, 126 S.Ct. 2387.

Hart completed a written grievance on May 14, 2007, using the State of Iowa Department of Corrections Offender Grievance Complaint form[8]. Docket no. 23-4, Exhibit JJ, p. 95. Hart provided the prisoner information requested in the form and

---

[8] The form requires general information about the prisoner, a "Description of Problem," "Grievant Signature," "Action Requested by Offender," and a description of the informal resolution procedures that the grievant has taken prior to filing the written grievance. Docket no. 23-4, Exhibit JJ, p. 95.

attached two typed pages describing his problems and the actions that he was requesting. Hart also stated, on the form, that the following informal resolution procedures had been performed: "On February 6, 2007, I sent a request to Warden Smith." In this request, Hart asks Warden Smith to rescind the January 27, 2007, memorandum that excludes him from the mail policy and denies him "equal opportunity for constructive correspondence." *See* docket no. 23-4, Exhibit BB, p. 82. On February 15, 2007, Warden Smith responded to Hart's letter. *See id*, Exhibit FF, p. 88. In the Warden's response, he refuses to rescind the restrictions and states: "I do not feel your equal opportunity rights to correspond are being restricted but monitored for appropriateness of the message you are sending to others." *Id*.

In response to Hart's May 14, 2007, grievance, Hart received a Grievance Response/Warden Appeal Response dated July 9, 2007. *Id*. at p. 100. The response states that no action would be taken on the grievance because a grievance must be filed "within 30 days of the alleged incident" and "the issues [Hart] raise occurred January, February, March, and April of 2007, and the grievance is untimely, no action shall be taken. Therefore, [the] paperwork shall be returned." *Id*. Hart appealed the response. *Id*. at 101.

In order for a prisoner in the IDOC system to properly exhaust his remedies, Offender Grievance Procedures require him to "attempt to resolve the grievance informally prior to filing a written grievance." *Id.*, Exhibit KK, at 107. Hart pursued the grievance informally with his February 6, 2007, letter to the Warden. *See id.*, Exhibit BB, p. 82. However, this letter only addresses the limitations placed on his correspondence in the January 27th memorandum and, therefore, only his claim regarding the correspondence limitations fulfills the requirement that the prisoner must "attempt to resolve the grievance informally prior to filing a written grievance." *Id.*, Exhibit KK, at 107. All other claims

on his grievance form were not properly exhausted [9] as Hart failed to complete all the steps in exhausting those claims[10]. *See Woodford*, 548 U.S. at 90, 126 S.Ct. at 2385 ([P]roper exhaustion of administrative remedies . . . "means using all steps that the agency holds out, and doing so properly. . . .") (citations omitted).

Even though Hart informally attempted to resolve the grievance on February 6, 2007, and received the Warden's response on February 15, 2007, Hart did not file his written grievance concerning the incidents identified in his February 6th letter until May 14, 2007. The procedures state that "[g]rievances must be filed with the Grievance Officer within 30 days of the alleged incidents." Docket no. 23-4, Exhibit KK, p. 105. Of course, May 14, 2007, is more than thirty days after the imposition of the restrictions on Hart's correspondence—it is also more than thirty days after the Warden informed him that the restrictions would remain. Although Hart claims that his grievance involved "continuing violations that extended well into the thirty day deadline," docket no. 24-2, his grievance failed to allege any instances where the restrictions were applied to his correspondence within thirty days of May 14, 2007. Instead, the only references to April 2007, and May 2007—in Hart's May 14, 2007, grievance—dealt with his exclusion from the AVP workshop, victims panel, and victim's impact class.

---

[9] In addition, "[o]nly one issue may be grieved per form," docket no. 23-4, Exhibit KK at 107, which is another rule that Hart violated with the list of grievances attached to his complaint.

[10] Hart describes other problems that do not clearly relate to his request for FDCF to remove the restrictions from his correspondence. For example, Hart states that in "May 2007, I continue to be excluded from repeating victims' impact." Docket no. 23-4, Exhibit JJ, p. 96. Similarly, Hart claims that in "April 2007, I was excluded from the victim's panel." *Id.*

The court does not suggest that Hart did not feel restrained by the restrictions within thirty days of his May 14th grievance. In fact, it is quite possible that Hart did not send mail that he would have otherwise sent had he not believed that he was restricted by the correspondence memorandum. However, the thirty day deadline and other IDOC Offender Grievance Procedures would be rendered meaningless if prisoners complaining of ongoing restrictions could file a written grievance without regard to: (1) when the restrictions were put in place; (2) when the prisoner attempted to informally resolve his grievance regarding the restrictions at issue; (3) when the prisoner last had the restrictions applied to his activities; or, at the very least, (4) when he last requested that the restrictions be lifted. In other words, Hart's May 14, 2007, grievance would have been timely had he repeated his request to remove the restrictions within thirty days of filing his written grievance. The court believes that prisoner's are entitled to reset the applicable thirty day deadline with such a request. To find otherwise would, in effect, make the thirty day deadline into a thirty day statute of limitations, and the court believes leaving the door open to resetting the thirty day deadline in this way balances the interests behind enforcing the thirty day deadline with those behind avoiding the unduly harsh imposition of a thirty day statute of limitations.

For the above reasons, the court finds that there are no genuine issues of material fact concerning whether Hart properly exhausted his administrative remedies, as required by § 1997e(a), *see Woodford*, 548 U.S. at 90, 126 S.Ct. at 2385, that Hart has not properly exhausted his remedies, and that the defendants are "entitled to judgment as a matter of law." *See* FED. R. CIV. PROC. 56(c) ("The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."). Because this case must be dismissed on procedural grounds, the

court will not reach the merits of Hart's First Amendment claim. However, the court will dismiss the case without prejudice and leave open the possibility that Hart will re-file this case. In order for Hart to maintain a subsequent action for the restrictions allegedly placed on his mail, at least two conditions must be present. First, Hart must be subject to the mail restrictions[11]. Second, Hart must properly exhaust the IDOC's grievance procedures.

## *IV. CONCLUSION*

THEREFORE, the court finds that the defendants' Motion for Summary Judgment (docket no. 23) is **granted**. Judge Zoss's Report and Recommendation is rejected as to reasoning and **accepted** as to result. This case is **dismissed in its entirety**, without prejudice.

**IT IS SO ORDERED.**

**DATED** this 21st day of September, 2009.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

---

[11] On August 6, 2009, Deborah Nichols signed an affidavit that states: "Staff at the Iowa State Penitentiary are not imposing any special restrictions on Hart's mail. Rather, Hart's mail is treated the same as other inmate mail at the institution." Docket no. 31.